IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR 10-00336-TUC-FRZ (JCG) |
| Plaintiff, ) | **REPORT AND RECOMMENDATION ON THIRD MOTION TO DISMISS** |
| vs. ) | |
| Asencion Alcantar-Mendivil, ) | |
| Defendant. ) | |

Pending before the Court is a Third Motion to Dismiss filed by Defendant on December 21, 2010. (Doc. 37.) The government filed a responses to the Motion on January 3, 2010. (Doc. 39.)   This matter came before the Court for a hearing and a report and recommendation as a result of a referral made on January 20, 2010, pursuant to LRCrim 5.1. Evidence was heard on January 20, 2011.  Defendant was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Third Motion to Dismiss.

//

//

**PROCEDURAL BACKGROUND**

On February 17, 2010, Defendant Asencion Alcantar-Mendivil was indicted for possession with intent to distribute 48.4 kilograms of marijuana in violation of Title 21, United States Code, Section 841(a)(1) and 841 (b)(1)(D). According to the complaint, Border Patrol agents using night vision equipment observed four individuals, three of whom were carrying bundles on their backs, loading bundles into the trunk of a vehicle. One of the individuals entered the passenger side of the vehicle. The other three ran into the brush. After agents stopped the vehicle, Defendant, the driver, consented to a search of the trunk and agents found five bundles of marijuana. Defendant and the passenger of the vehicle were arrested. The passenger was not charged and was later deported.

On September 23, 2010, Defendant filed a Motion to Dismiss ("First Motion to Dismiss") for bad faith destruction of evidence. (Doc. 20.) Defendant alleged that on the night of his arrest, after being read his *Miranda* rights, Defendant made an exculpatory statement, specifically that he was not aware that there was marijuana in the vehicle until after the vehicle was searched and the marijuana found. Defendant further contended that the government's failure to memorialize Defendant's statement was grounds for dismissal pursuant to *Arizona v. Youngblood*, 488 U.S. 51 (1989). On October 13, 2010, the Magistrate filed a Report & Recommendation recommending that Defendant's First Motion to Dismiss be denied on the ground that *Youngblood* was not applicable and that officers had no legal duty to create a record of Defendant's alleged statement. (Doc. 26.) The Report and Recommendation was adopted on November 24, 2010. (Doc. 31.)

On December 9, 2010, Defendant filed his Second Motion to Dismiss. (Doc. 33.) In his Second Motion to Dismiss, Defendant argues that the government's deportation of a potentially exculpatory witness violated his Fifth and Sixth Amendment rights. This matter is scheduled to be heard on February 4, 2010.

On December 21, 2010, Defendant filed his Third Motion to Dismiss. (Doc. 37.) In his Third Motion to Dismiss, Defendant contends that subsequent to the Court's denial of his First Motion to Dismiss, Defendant discovered that the Border Patrol Agent who took

1 Defendant's statement was contemporaneously taking notes. Defendant alleges that the
2 government's failure to preserve and disclose the agent's notes violated Defendant's due
3 process rights.

## FACTUAL BACKGROUND

5 At the hearing, the government presented the testimony of Border Patrol Agents Tait
6 Seelhorst and Anthony Anders.[1] The agents stopped Defendant's vehicle on January 18,
7 2010, approximately five to ten minutes after observing individuals place bundles in the
8 trunk. Agent Anders testified that he read Defendant his *Miranda* rights at the scene after
9 discovering the bundles of marijuana, but did not question Defendant, other than to ask his
10 citizenship. Agent Seelhorst also testified that he did not question Defendant. Both stated
11 that it is Border Patrol procedure to refer drug investigations involving U.S. citizens to the
12 DEA for investigation. Both agents also testified that Defendant may have made spontaneous
13 statements at the scene, but they did not recall any statements and also that the statements
14 were not in response to any questions the agents asked. Neither memorialized any statements
15 because they did not believe that any statements made were important or pertinent.[2]

16 Agent Anders took notes at the scene; the notes pertained solely to the vehicle and he
17 took notes so that he could complete seizure paperwork. Agent Anders believes that he
18 threw away the notes after he completed the computer paperwork. The notes were
19 incorporated into the vehicle seizure report.

20 At the station, Agent Seelhorst read Defendant his *Miranda* rights and Defendant
21 signed a waiver of rights. Seelhorst obtained biographical information from Defendant, but
22 did not interview Defendant, believing the DEA would be taking over the investigation.
23 Agent Seelhorst testified that it was possible that Defendant made spontaneous statements
24 at the station, but he doesn't recall any such statements and did not record any statements.

---

[1] Agents Seelhorst and Anders have been Border Patrol agents since April 2006.

[2] On cross-examination, Agent Seelhorst stated that he would think it was significant if the Defendant had stated that he thought there were aliens in the trunk of his car. Seelhorst testified he does not recall Defendant denying knowledge of the marijuana in the trunk.

- 3 -

1 Neither Border Patrol agent had contact with any DEA agent assigned to the investigation.

2 Defendant also testified at the evidentiary hearing. Defendant's testimony was 3 confusing, inconsistent, and lacking specific details. Defendant testified that he first became 4 aware that there was marijuana in the trunk of his car when the Border Patrol agents searched 5 his trunk. He claimed that he was out in the remote desert area that night to pick up an 6 undocumented alien, for which he expected to receive $500.00. He stopped his car to pick 7 up a person who was waving his hands in the street and opened his trunk (presumably from 8 inside of his car) so the person could get in the trunk. Then four to six people suddenly 9 surrounded the car – running around and trying to get in the car through all the doors, 10 including the driver's door. He saw a light of the Border Patrol car coming, panicked and 11 wanted to leave. The person that tried to get into the passenger side did not appear to 12 Defendant to be the person that he was to pick up so Defendant pushed him out of the 13 vehicle, but he got in again. Defendant was confused because he saw the light of the Border 14 Patrol car. He did a u-turn and drove away. He looked to his left and the Border Patrol car 15 was parked right there, just waiting for him to pass. As soon as he passed the Border Patrol 16 car, agents did a u-turn and pulled him over.

17 Defendant testified that agents did not ask for his identification, only for consent to 18 look in the trunk, which he gave. When agents told him they had found marijuana, agents 19 asked him how much dope he had. Defendant responded, "I never saw any dope" and "I 20 didn't know." He also testified that he said "I didn't know there was marijuana in the 21 vehicle," that he was out there to pick up an illegal alien, and that agents responded it would 22 be discussed at the station with someone else.

23 Defendant admitted that he was *Mirandized* at the station and agreed to answer 24 questions. About an hour later, he gave a statement, but not to Border Patrol agents. He 25 doesn't know who he talked to, other than he was "a North American, light skinned," stocky 26 and bald who possibly had blue eyes. The man was wearing a plain dark colored t-shirt; he 27 couldn't remember if it was black or navy blue. The man took notes on scratch paper and 28 asked questions about what happened. The man told him to cooperate with him and that he

1  was going to help him if he did. Defendant claimed that he told him he didn't know about
2  the dope and that he had been at that location to pick up one illegal alien.

3  On cross-examination, Defendant testified that he had made arrangements with a man
4  named Chiparro in Agua Prieta to pick up the illegal alien. Chiparro gave him a cell phone
5  so that the alien could direct Defendant to the pick up location. Once he arrived at the place,
6  there was an individual standing there on the phone. The individual came out to the street
7  waving his hands probably because he saw Defendant's vehicle lights. At the scene, four to
8  six people approached the car. Defendant had opened the trunk for the one alien to climb in.
9  The other four to six people were on both sides of the car, trying to get in. One was reaching
10 through the driver's side window to try to put in his hand to open the door. The passenger
11 door was open and a person got in. Defendant was wrestling with this person, pushing him
12 "off the car" because it was not the person that had been described to him to pick up. Once
13 the alien was in the car beside him, he talked to him in Spanish. He does not know what
14 happened to the alien he was supposed to pick up or the other people surrounding his car.
15 Defendant said everyone ran when they saw the lights of the Border Patrol coming towards
16 them.

17 On cross-examination, however, Defendant also acknowledged that he did not come
18 into contact with Border Patrol agents at the location where he stopped to pick up the alien.
19 He again testified that the agents' car was waiting down the road and once Defendant made
20 a u-turn and passed the agents' vehicle, the Border Patrol agents made a u-turn and pulled
21 him over.

22 Defendant admitted that he did not make certain statements to the Border Patrol agents
23 who stopped his car. When asked, "didn't you just testify that you told them that you thought
24 there were aliens in there, in the vehicle?", Defendant responded:

25     I didn't - - I didn't - - I - - I told them - - I told them - - I tried to tell them
    that - - that I went to pick up for an illegal alien but they - - they didn't want
26     to listen to me, they said you - - you're going to have your time to talk to
    someone at the Border Patrol station that wasn't them.
27
(Doc. 51, p. 48.)
28

- 5 -

1  On cross-examination, Defendant stated that the agent who *Mirandized* him at the station was the same one who took his statement. He also added the fact that the individual who took his statement was wearing camouflage pants in addition to the dark t-shirt. And he testified on cross-examination that the color of the shirt was black.

The government did not provide any testimony regarding DEA's investigation of the charges against Defendant. The government's written submission states that while the Defendant waived his rights and agreed to speak to agents, he was never interviewed.

## ANALYSIS

In his Motion, Defendant contends that he made a statement, the statement was memorialized by a government agent, and the government has failed to disclose it. Specifically, the Motion asserts that a Border Patrol agent took notes of Defendant's statements at the scene. At the hearing, Defendant argued that a DEA agent interviewed Defendant and took notes of the interview. Defendant contends that the government's failure to disclosure these notes violates *Brady v. Maryland*, 373 U.S. 83 (1963), and warrants dismissal of this action. Defendant also contends that to the extent the government cannot disclose the agents' notes of the Defendant's statement because the notes were not kept, the government's failure to preserve the notes violates *Trombetta v. California*, 467 U.S. 479 (1984).

**1.   No *Brady* violation**

There are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Although a contemporaneous statement from Defendant denying knowledge of the marijuana would be exculpatory evidence satisfying the first prong of *Brady*, Defendant has failed to meet his burden with respect to the second and third prongs. In addition, even if the alleged *Brady* violation had occurred, dismissal would not be the appropriate remedy.

**a.   No evidence that a statement was suppressed by the State**

There is no evidence that the government has suppressed evidence of a statement made by Defendant. First, Defendant has failed to demonstrate that any statement was ever made. Although Defendant first testified that he made statements to the arresting Border Patrol officers, he testified on cross-examination that he tried to talk to agents, but they told him to wait to tell his story later. Both Border Patrol agents testified credibly that they did not interview Defendant at the scene and do not recall him making any statements of significance.

Likewise, there is insufficient credible evidence that Defendant was interviewed by and gave a statement to a DEA agent at the station. Defendant never identified his alleged interviewer as a DEA agent; he could not identify the agency that the alleged interviewer was from. He gave a general description of the interviewer and embellished the description with further detail on cross-examination. Defendant provided few details about the interview itself except for those that benefitted the Defendant, *ie*. that he made denials about his involvement in the marijuana. Defense counsel accurately summed up the strength of the testimony with his statement: "I'm left with the feeling after the testimony . . . that my client was interviewed, not by Border Patrol agent, but by a DEA agent. . . . I think that's the – the conclusion that is apparent and probable in this case." The Magistrate agrees with defense counsel's description of the strength of the evidence - it leaves one with a vague feeling of a possible scenario. But this vague feeling of what might have happened is insufficient to provide a basis for concluding that an interview occurred or statements were made.

Second, even if Defendant did make statements, there is insufficient evidence demonstrating that the statements were recorded. Both Border Patrol agents testified credibly that they did not take any notes or make any reports regarding any statements made by Defendant. Agent Anders' credibility on this issue was strengthened by the fact that he was able to recall taking notes at the scene pertaining solely to the vehicle. The only evidence suggesting that notes of Defendant's statement were taken by an agent at the station is Defendant's own testimony, which was not credible. Defendant testified that the agent who *Mirandized* him at the station was also the agent who interviewed him an hour later and that

this agent was not with Border Patrol; this testimony conflicted with Agent Seelhorst's testimony that he *Mirandized* Defendant at the station. As stated above, Defendant also offered differing accounts concerning the appearance of the agent who allegedly interviewed him.

### b. No prejudice

In addition, Defendant has failed to demonstrate the requisite prejudice, the third prong of the *Brady* standard. "The touchstone of [the prejudice analysis] is whether admission of the suppressed evidence would have created a reasonable probability of a different result." *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (citation omitted). The Supreme Court has "defined a 'reasonable probability' as 'a probability sufficient to undermine confidence in the outcome'" of the trial. *United States v. Bagley*, 473 U.S. 667, 680 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

Even assuming that the Defendant made an exculpatory statement and the statement was suppressed, the prejudice standard is not met in the present case. Trial has not occurred. At a trial, Defendant may still testify that he was unaware that marijuana had been placed in the trunk of his car. However, his alleged denial of knowledge of the marijuana, made to officers after his arrest, would not be admissible regardless of whether that post-arrest statement was documented or not, because it would likely be considered inadmissible hearsay. Neither the Defendant nor a law enforcement officer could testify at trial that Defendant denied knowledge of the marijuana at the time of his arrest, because the statement would constitute an out-of-court statement admitted to prove the truth of the matter asserted. No hearsay exceptions would permit that statement to be admitted.[3] Accordingly, even if

---

[3] Although Rule 801(d)(1)(B) states that a statement is not hearsay if the declarant testifies at trial, is subject to cross examination and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive," that Rule does not apply in this case. Prior consistent statements made after the date of the alleged motivation to lie are inadmissible. *See United States v. Bao*, 189 F.3d 860 (9th Cir. 1999). By the time Defendant made his alleged statements to agents, he had been arrested and already had a motive to deny culpability.

- 8 -

Defendant obtained evidence of his alleged statement to officers, *ie.* a written report of the statement, the disclosure would not reasonably lead to a different result at trial.

### c. Dismissal not appropriate

"[R]emedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). "Because it is a drastic step, dismissing an indictment is a disfavored remedy." *United States v. Rogers*, 751 F.2d 1074, 1076-77 (9th Cir. 1985) (citing *United States v. Blue*, 384 U.S. 251, 255 (1966)). A *Brady* violation justifies or requires dismissal of the indictment only in cases rising "to the level of flagrant prosecutorial misconduct." *See United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008). In the present case, there is no evidence of any prosecutorial misconduct, much less misconduct that could be described as "flagrant."

### 2. No *Trombetta* violation

As stated in the Magistrate's previous Report and Recommendation, there is no basis for concluding that the government conducted a due process violation by failing to collect/preserve and disclose statements if such statements were in fact made and recorded. The government has a duty to preserve evidence if (1) the evidence is material and exculpatory in nature, (2) the exculpatory value of the evidence is apparent before the evidence is destroyed, and (3) the defendant is unable to obtain comparable evidence by other reasonably available means. *See Trombetta v. California*, 467 U.S. 479, 489 (1984). Defendant has failed to satisfy the third prong of *Trombetta* because he is able to obtain comparable evidence by other reasonably available means – by testifying as to his statement. As discussed in the previous section, a written record of Defendant's post-arrest statements would not permit the introduction of any additional evidence at trial.

### RECOMMENDATION

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY the Third Motion to Dismiss filed by Defendant on December 21, 2010. (Doc. 37.)

1  The parties have **fourteen (14) days** to serve and file written objections to the Report
2  and Recommendation.  The parties are advised that any objections should be filed with the
3  following caption: **10-00336-TUC-FRZ**.
4  DATED this 28th day of January, 2011.

Jennifer C. Guerin
United States Magistrate Judge